# UNITED STATES DISTRICT COURT

### for the
### Southern District of California



In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)    Case No.
One iPhone 6, white in black case, with serial number )
DNPQ94MCGRYH, currently located at 10385 Vista )
Sorrento Parkway, San Diego, CA 92121 )

## APPLICATION FOR A SEARCH WARRANT   18MJ6297

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the      Southern      District of      California      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | Conspiracy |
| 15 U.S.C. § § 78j(b), 78ff, and | Securities Fraud |
| 17 C.F.R. § 240.10b-5 | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA John Roberts
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/14/18

_____
*Judge's signature*

City and state:  San Diego, California

U.S. Magistrate Judge Barbara L. Major
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, John W. Roberts, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the San Diego Division. I have been employed by the FBI as a SA since October 1999. I graduated from the College of the Holy Cross in 1995, with a degree in Accounting and Mathematics. From 1995 to 1999, I worked as a financial auditor at a major international accounting firm. During this time, I also received a license as a Certified Public Accountant in the Commonwealth of Massachusetts.

2. While working as a SA, I have conducted, or participated in, investigations of various violations of federal law, including white collar crime. Among other things, I have conducted, and assisted in, the execution of numerous arrest warrants, search warrants, and seizure warrants in investigations. Since June 2000, I have been assigned to squads responsible for investigating white collar offenses. The squad to which I am currently assigned specializes in investigating all forms of economic crime, including corporate, securities, financial institution, bank and investment fraud.

3. In the nearly nineteen years I have been assigned to investigate financial crimes, I have become experienced in investigations involving all types of economic crimes, including the methods and means employed by individuals who engage in these offenses. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI, other federal agents and officers, and securities regulators who have expertise in investigations involving economic crime. I have attended training

courses covering the topics of fraud and white collar crime, and other types of criminal violations.

4.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and records related to this investigation; recorded conversations with insiders; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search and seizure warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation

5.     This affidavit is made in support of an application to search the following cellular telephone:

> a. One iPhone 6, white in black case, with serial number DNPQ94MCGRYH (hereinafter referred to as "SUBJECT TELEPHONE");

for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 occurring from January 1, 2016 through July 5, 2018.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371, and 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 have been committed by the user of the SUBJECT TELEPHONE. There is also probable cause to believe that a search of the SUBJECT

1 TELEPHONE (as more particularly described in Attachment A) will reveal
2 evidence of these crimes (as more particularly described in Attachment
3 B).

PROBABLE CAUSE SURROUNDING THE CRIMINAL CONDUCT

4

5 THE INDICTMENT IN THIS CASE

6      7.   On June 29, 2018, a federal grand jury sitting in the Southern
7 District of California handed down a sealed indictment against Gannon
8 Giguiere and Oliver Lindsay.  The indictment, which the Court has since
9 unsealed, charges Giguiere and Lindsay with conspiracy to commit
10 securities fraud in violation of 18 U.S.C. § 371, and securities fraud
11 in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

12      8.   The indictment alleges a conspiracy to conduct two market
13 manipulation and pump-and-dump schemes.  One of those schemes involved
14 Giguiere's and Lindsay's manipulation of the stock of Kelvin Medical,
15 Inc., which began in or about October 2017, and continued until in or
16 about March 2018.  The second scheme involved Giguiere's manipulation
17 of the stock of Eco Science Solutions, Inc.; I am not aware of facts
18 indicating that Lindsay was involved in the latter scheme.

19 BACKGROUND

20      Pump-and-Dump Schemes Generally

21      9.   Based on my training and experience, and from consultation
22 with other agents and securities regulators, I know that fraudulent
23 schemes surrounding the issuance, marketing, and trading of and in the
24 stock of small, thinly-capitalized (or "microcap") companies have been
25 widespread for years.  Although these frauds vary in their particulars,
26 in a typical scheme co-conspirators (1) secretly obtain control over a
27 small company that has shares of stock that can be publicly-traded, (2)
28 artificially inflate the price of the stock (the "pump") through

3

misleading corporate disclosures, call rooms, and stock promotion techniques (including, for example, penny stock newsletters and internet advertising), and (3) sell their stock into the rising market for significant profits (the "dump"). Stock prices almost invariably go down as a result of the dump, leaving innocent stockholders with significant losses.

10. There are many aspects to a successful manipulation scheme, including the following:

a. Reaching agreement on conspirator roles. Co-conspirators often play various roles in market manipulation schemes. This is driven by the development of particular competencies, and a desire to separate activities so regulators and law enforcement have a harder time linking all aspects of the scheme. Some people create, or obtain and clean up, a corporate shell that is suitable for manipulation. Others promote the stock through call rooms, internet pages, or penny stock newsletters. Still others hold the conspirators' shares that they will sell into the rising market and distribute the proceeds to the conspirators. All of these players are essential to a successful scheme, and co-conspirators sometimes reach an agreement on who covers what costs, and how much of the proceeds will go to which conspirators.

b. Controlling the company's outstanding shares. Manipulators are more successful when they control larger blocks of free trading shares. This allows them to impact the market price more easily, and decreases the chances that other market participants will place downward pressure on the stock price while the conspirators are trying to increase the price.

c. Using nominee accounts. Manipulators almost always control bank and brokerage accounts, but often hold those accounts in

4

the name of other individuals or entities.   This hides the fact that, e.g., those persons involved in the manipulation also manage and control significant aspects of the business, and persons selling stock into a rising market (the "dump") are also responsible for promotional efforts. Spreading out the shares among a larger number of nominee accounts also conceals that one person or group is responsible for most of the open-market activity in a stock, and facilitates manipulative trading in the stock.

　　　　　d.   <u>Press Releases and Corporate Developments.</u>   Stock manipulators are able to sell the majority of their shares at relatively high prices by getting innocent investors interested in the stock.   Co-conspirators often spend significant time developing an idea or product that the Company is supposedly pursuing.   They then cause the company to issue press releases.   These releases often have a nugget of truth that is exaggerated or presented in a misleading way.   Press releases are often issued in conjunction with efforts to promote the stock in other ways.

　　　　　e.   <u>Stock Promotion.</u>   Stocks are sometimes promoted through high-pressure call rooms, stock newsletters, and advertisements on finance websites.   The point of these efforts is the same as that of press releases - to get everyday investors interested in the stock, which will increase demand for the stock.  This has two salutary effects: the stock's price and volume increase, and the co-conspirators have enough people to whom to sell their stock at inflated prices.  Promotions often tout recent corporate disclosures as a reason to buy the stock.

　　　　　f.   <u>"Building the Chart."</u>   Co-conspirators commonly trade stock between two or more accounts that they control, and engage in other forms of manipulative trading.   Seeing a recent history of

increases in the price and volume of a given stock often incentivizes investors who have been exposed to promotions – investors who look up the stock chart on the internet can see upward trends that solidify their decision to invest in the company.

   g. <u>Controlled Stock Sales.</u> Co-conspirators often seek steady, consistent and predictable movements in a stock's price and volume.  They are able to get and keep investors interested in the stock if the price goes up steadily, as opposed to suddenly.  This way, the conspirators can sell shares for longer periods of time, and ultimately sell more shares for higher prices, on average, than they can when there are dramatic swings in prices and volumes.  Co-conspirators also seek to avoid sudden shifts because they would rather not attract the attention of regulators and law enforcement. Even during the promotional period, they also engage in manipulative trading to support the appearance of strong investor demand for the stock.

   h. <u>Distributing the fraudulent proceeds.</u> One person or group of co-conspirators is often responsible for selling the conspirators' shares into the market.  They then often transfer money through intermediary accounts, many of them offshore, when distributing the proceeds to the co-conspirators who were responsible for other aspects of the scheme, <u>e.g.</u>, the company's management or the shell broker.

  <u>The Individuals and Entities Involved</u>

  11. Gannon Giguiere – Based on information obtained from social media websites, Giguiere has experience in information technology, having worked as Senior Director of Search at AltaVista, the internet search company.  Based on his recorded statements, a review of the

website itself, and according to CHS,[1] Giguiere has operated a stock promotion website called TheMoneyStreet.com since at least as early as 2016. Based on the evidence gathered in this case, some of which is discussed below, I believe Giguiere was involved in the manipulation of the stock of Kelvin Medical, Inc. (Ticker: KVMD, or "Kelvin Medical"), among others.

12. CHS – CHS has admitted to investigators that he has been involved in penny stock fraud for many years, and has had contact with many other repeat players in the industry. CHS states that, since at least as early as 2016, he was involved in the promotion of stocks through TheMoneyStreet.com. CHS and his associate, Gannon Giguiere, paid for advertisements on websites like Yahoo Finance, where a click on the ad links to a TheMoneyStreet.com landing page touting a particular stock. CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with Giguiere, Lindsay, and others regarding the manipulation of many stocks.

13. Oliver Lindsay – According to U.S. law enforcement databases, Oliver Lindsay ("Lindsay") is a Canadian citizen. According to CHS, and Lindsay's statements during recorded phone calls, Lindsay primarily resided in Georgetown, Cayman Islands before his arrest in this case. Based on Lindsay's statements during recorded phone calls, Lindsay operated an offshore brokerage firm known as CMGT Capital Management

---

[1] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme relating to the 2012 manipulation Cuba Beverage Company. When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice. CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

("CMGT"). Based on the evidence gathered in this case, much of which is discussed below, I believe Lindsay was involved, along with Giguiere, in the manipulation of the stock of Kelvin Medical, among others. The SUBJECT TELEPHONE was seized from Lindsay on July 5, 2018.

14. According to its filings with the United States Securities and Exchange Commission ("SEC"), Kelvin Medical was a Nevada Corporation with its principal place of business in Nevada City, California, and purported to be an "early participant in medical device and telehealth wearables with a focus on the development of artificial intelligence driven physical therapeutic technologies."

THE MANIPULATION SCHEME REGARDING KELVIN MEDICAL, INC. STOCK

15. According to CHS, and Giguiere's statements on recorded telephone calls, attorney Sharon Mitchell, who was Kelvin Medical's corporate counsel, contacted Giguiere about becoming involved with Kelvin Medical, Inc.

16. Based on Giguiere's recorded statements, Mitchell was unable to collect on her legal fees from other individuals previously associated with Kelvin Medical. Mitchell then approached Giguiere, who agreed to pay Mitchell's outstanding fees of $60,000 in order to obtain shares of Kelvin Medical stock and access to the company's management.

Control over Kelvin Medical Stock

17. According to brokerage records obtained during the investigation, Phenix Ventures, LLC ("Phenix Ventures") purchased 1.5 million shares from an entity controlled by Mitchell, and deposited these shares in a domestic brokerage account (the "Domestic Brokerage Account"). According to Kelvin Medical's filings with the SEC, Giguiere was the "Managing Member" of Phenix Ventures.

8

18.  According to Giguiere's and Lindsay's recorded statements, and attachments to messages sent to and from these two individuals, Giguiere arranged for a nominee entity to purchase a separate 1.5 million shares from Mitchell.  According to brokerage records and Giguiere's and Lindsay's recorded statements, these shares were maintained in an entity's account at CMGT.  According to recorded statements made by Giguiere and Lindsay, Lindsay managed and controlled trading activity in this entity's account on behalf of Giguiere.

19.  According to Giguiere's recorded statements, he pursued other ways by which he could own or control most of Kelvin Medical's free-trading shares, including through additional purchases of stock directly from Kelvin Medical, and purchases of shares from "friends and family" of individuals previously associated with Kelvin Medical.

20.  During a recorded call on January 22, 2018 with Lindsay and CHS, Giguiere stated that "the attorney wants me not to buy them [the friends and family shares] in my name," so Giguiere wanted to purchase those shares "somehow through CMGT, using, you know, cash that we've created."  Lindsay responded: "We can do it tomorrow.  I have … a corporation we can use that has an account.  It will be a fresh name and everything."  Giguiere then stated: "Sell a little bit of what you have on hand and just use that cash."  Giguiere also stated that after his contemplated additional purchases of Kelvin Medical stock, he would own "100 percent of the balance" of the company's free trading stock.

21.  On March 9, 2018, Lindsay sent a message stating, in part, "it would be great to see the DTC."  Based on my training and experience, the phrase DTC refers to a list of a company's shareholders obtained from the Depository Trust Corporation, a securities clearinghouse.  Giguiere responded: "Your universe owns all shares in the float."

9

1    "Building the Chart" through Manipulative Trading

2      22.  Based on my training and experience, and discussions with
3 securities regulators, I know that one type of manipulative trading
4 involves matched trades.  A matched trade is an order to buy or sell
5 securities that is entered with knowledge that a matching order on the
6 opposite side of the transaction has been or will be entered for the
7 purpose of (a) creating a false or misleading appearance of active
8 trading in any publicly traded security or (b) creating a false or
9 misleading appearance with respect to the market for any such security.

10      23.  Based on my training and experience, I believe that a number
11 of statements made by the Giguiere and Lindsay show an intent to
12 manipulate the price and volume of Kelvin Medical stock in late 2017 and
13 early 2018 through matched trades.

14      24.  On a November 27, 2017 recorded call with CHS, Giguiere made
15 several references to manipulating Kelvin Medical stock.  For example,
16 Giguiere stated: "Now, if we have 1.5 million shares, well, we have
17 three million shares to sell, well then that's, we can suck down a lot
18 of traffic, right?  … Because we can manage -- the nice thing about it
19 is we can manage the price appreciation."

20      25.  On the same call, CHS asked Giguiere "where would you like to
21 see it on the 27th." Based on other statements during the call, I believe
22 this question refers to the planned promotion start date on December 27,
23 2017.  Giguiere responded "a dollar."  Giguiere also stated on the call:
24 "We've got 2.9 million shares, um, that, you know, we'll be able to sell
25 as we allow this thing to go from a dollar to let's say 2 dollars."

26      26.  On November 29, 2017, Giguiere stated in a message to Lindsay
27 and CHS, "I have offers of $5,000 GTC ["good til close" orders] laddered

28

in .10 increments up to 1.00 FYI. … so you guys can do your thing now as BMA is clear."

27. In a November 30, 2017 text, CHS stated, in part: "ollie [Lindsay], Thanks for the KV[MD] support bids/buys today. I think and please G [Giguiere] chime in, it can just rest a few days." Lindsay responded: "Yes. I'm leaking the ticker to a few greedy people in a vague fashion. Bids should be ther [sic]. But I agree w/ [CHS]." Giguiere added: "I suggest 1500 to 2000 shares a day in KV[MD] at .55 and I will just have a large offer there showing min, for the next 5 to 7 trading days. let's let a week go by right here with a little volume and at this price. then we can move it."

28. On December 5, 2017, Giguiere sent a message to Lindsay and CHS stating "I will move BMA [Giguiere's brokerage firm] to offer 3,000 at .75 …, meaning I will drop them to 3000 from 50000 … and then Ollie [Oliver Lindsay] can come in alongside them at .75." He then stated "I will have BMA then move to .85 at 1000. … So they can sell a touch up to 1. … so will have them at .95 for 1000 and 1 for 1000." Giguiere also explained the reason for these bids and offers: "so it moves in nickles [sic]."

29. On and in many additional recorded calls and messages, Giguiere made statements similar to the foregoing that, based on my training and experience, represent an effort to coordinate trading and thereby increase the published price and trading volume of Kelvin Medical's stock.

30. On December 8, 2017, Lindsay stated on a recorded call with CHS, "for some reason I'm a little bit, uh, hesitant about typing in all these details into this app. ... You can just imagine if it finds its way somewhere its fairly, ah, incriminating."

31.  On December 20, 2017, Lindsay stated on a recorded call with CHS: "You and I talked about this before.  I just mentioned to Gannon that some of these text messages look just like really evil.  I'd rather just pick up the phone."

32.  On a March 14, 2018 call with Giguiere, Lindsay and CHS, Lindsay stated "I don't like typing some of this, these details in so that's why I wanted to give a quick call."  Giguiere replied: "No, I totally agree, calls are, are, better, not trackable."

Corporate Disclosures

33.  On or about August 1, 2016, Kelvin Medical submitted to the SEC a registration statement on Form S-1 that stated: "We are a Medical Device technology company that engages in the development, eventual production and sale of a hot cold treatment device."   The device, according to the registration statement, was known as "Therm-N-Ice."

34.  On or about December 11, 2017, Giguiere participated on a recorded call with CHS.   Giguiere stated: "If you look at their materials, and you look at their S-1, there's really nothing, okay.  And when you ask management, there's really … there's kind of nothing there."  CHS responded, in part, "so you're expanding his company .. and his story."  Giguiere replied: "Substantially….We're making the whole story up.  I mean this guy's story is I can put on a heat pad and a cold pad at the same time.  Not interesting."

35.  Giguiere stated on a January 17, 2018 group chat with Lindsay and CHS that he "[s]ent out KV Framework doc they are preparing to file 8K on."

36.  On or about January 18, 2017, Kelvin Medical submitted to the SEC a current report on SEC Form 8-K that stated "Kelvin Medical, Inc. is focused on developing and launching next generation telehealth

wearable technologies, for tracking, diagnostics, and therapeutic delivery, that positively impact one's health and well-being. Our strategy not only focuses on those seeking to age gracefully and pain free through telehealth management, but also on the most competitive athlete working to maximize their bodily output.  Our Company intends to leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies to increase the recovery and performance of the body."

37.  On a January 18, 2018 call with CHS, Giguiere stated: "When, when this was presented to them [Kelvin Medical management] their jaws just hit the table 'cuz they're like 'I don't even know what you're talking about but it sounds great.'"

Promotional Activity

38.  As previously discussed,  CHS has reported that Giguiere manages and controls a website known as TheMoneyStreet.com, which promotes certain companies and their stocks.  CHS states that he worked with Giguiere on several stock promotions on TheMoneyStreet.com, including the promotion of Kelvin Medical and Eco Science Solutions.

39.  On a recorded January 18, 2018 call with CHS, Giguiere stated that TheMoneyStreet.com's "landing page" for its promotion of Kelvin Medical was live, but "hidden".  According to Giguiere's recorded statements, and agents' review of TheMoneyStreet.com website, the landing page became accessible to the public beginning on or about January 29, 2018 through in or about March 2018.

40.  I am aware of evidence that Lindsay hired a phone room to promote Kelvin Medical stock.  In a December 18, 2017 message to CHS about trading in Kelvin Medical stock, Lindsay attributed some trades

to a phone room. "The bids this morning were phone room. He'll do more tomorrow."

41. According to popular financial websites, Kelvin Medical's stock price increased significantly during the period that Giguiere and Lindsay were involved in manipulative trading and promoting the stock. Its share price on November 29, 2017 was approximately $.22 per share. By March 20, 2018, the price was up to approximately $1.60 per share.

### False Statements to Securities Brokers

42. On October 25, 2017, Giguiere represented to his securities broker in a "Rule 144 Seller's Representation Letter" that he "is not at present and has not been during the preceding three months, an officer, director, or 10% shareholder of the Company or in any other way an 'affiliate' of the Company." Shortly thereafter, on November 1, 2017, Giguiere signed a questionnaire in which he answered "no" to the question "[d]oes the client [Giguiere] have any relationship with the issuer or its securities?"

### Sales of Kelvin Medical Stock

43. According to brokerage records, Phenix Venture's domestic brokerage account obtained over $1.6 million from the sale of 1.5 million shares of Kelvin Medical stock from on or about November 29, 2017 through on or about January 16, 2018. Many of these sales were to Lindsay's clients.

44. In a March 12, 2018 message to Lindsay and CHS, Giguiere stated: "as for the 1.5 [million shares] you have at CMGT, let's offload that as quickly as we can…3M [shares] more coming..so net net would like to get 1.5 [million] sold at 1.5 [dollars per share] and change and the 3m [shares] sold at 2.5 to 3 [per share]." Lindsay replied "yes!!"

45. Based on a review of brokerage records, from on or about December 8, 2017 through on or about March 15, 2018, Lindsay sold, or caused to be sold, approximately 263,000 shares of Kelvin Medical stock from the CMGT Accounts for gross proceeds of approximately $375,110.49.

The SEC's Suspension of Trading in Kelvin Medical Stock

46. Based on information provided by the FBI, and the SEC's own analysis of the risks to investors who might transact in Kelvin Medical stock, the SEC suspended trading in the company's stock on March 20, 2018.

47. Giguiere, Lindsay and CHS discussed what may have caused the suspension, and the ramifications, in many calls and messages, which began the same day they learned of the suspension.

48. On a recorded March 20, 2018 with CHS, Giguiere speculated that the SEC reviewed Kelvin Medical's corporate disclosures and trading activity and concluded that the suspension was put in place because of several factors, including a significant increase in the company's stock price, and the lack of a product, employees, business or financing.

PROBABLE CAUSE SURROUNDING THE SUBJECT TELEPHONE

49. The SUBJECT TELEPHONE was seized from Lindsay by the FBI on July 5, 2018, at the time Lindsay was arrested pursuant to the indictment in this case.

50. Giguiere (who lives in Orange County, California), Lindsay (who lived in the Cayman Islands), and CHS communicated frequently over the course of the Kelvin Medical scheme.  These communications included a significant volume of phone calls, emails, and text messages, including

1 messages transmitted via encrypted messaging platforms, such as WhatsApp
2 and Snapchat.

3     51.  Lindsay gave to CHS a specific phone number by which CHS could
4 communicate with Lindsay.  CHS used this phone number to contact Lindsay
5 throughout the manipulation schemes described above.  After the SUBJECT
6 TELEPHONE was seized, the FBI called the number that Lindsay gave to
7 CHS, and the SUBJECT TELEPHONE rang.

8     52.  On a recorded call, CHS asked Lindsay what devices he uses to
9 communicate with CHS.  Lindsay stated he uses one or more iPhones for
10 all of his communications, including SnapChat, WhatsApp, Telegram, and
11 Proton mail.

12     53.  Based on training and experience, the encrypted apps Lindsay
13 used to communicate with Giguiere and CHS are often used on a cell phone,
14 and these apps are readily available in the relevant app stores.

15                PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

16     54.  It is not possible to determine, merely by knowing the cellular
17 telephone's make, model and serial number, the nature and types of
18 services to which the device is subscribed and the nature of the data
19 stored on the device.  Cellular devices today can be simple cellular
20 telephones and text message devices, can include cameras, can serve as
21 personal digital assistants and have functions such as calendars and
22 full address books and can be mini-computers allowing for electronic
23 mail services, web services and rudimentary word processing.  An
24 increasing number of cellular service providers now allow for their
25 subscribers to access their device over the internet and remotely destroy
26 all of the data contained on the device.  For that reason, the device
27 may only be powered in a secure environment or, if possible, started in
28 "flight mode" which disables access to the network.  Unlike typical

1  computers, many cellular telephones do not have hard drives or hard
2  drive equivalents and store information in volatile memory within the
3  device or in memory cards inserted into the device.  Current technology
4  provides some solutions for acquiring some of the data stored in some
5  cellular telephone models using forensic hardware and software.  Even
6  if some of the stored information on the device may be acquired
7  forensically, not all of the data subject to seizure may be so acquired.
8  For devices that are not subject to forensic data acquisition or that
9  have potentially relevant data stored that is not subject to such
10 acquisition, the examiner must inspect the device manually and record
11 the process and the results using digital photography.  This process is
12 time and labor intensive and may take weeks or longer.

13      55.  Following the issuance of this warrant, investigators will
14 collect the subject cellular telephone and subject it to analysis.  All
15 forensic analysis of the data contained within the telephone and its
16 memory card will employ search protocols directed exclusively to the
17 identification and extraction of data within the scope of this warrant.

18      56.  Based on the foregoing, identifying and extracting data
19 subject to seizure pursuant to this warrant may require a range of data
20 analysis techniques, including manual review, and, consequently, may
21 take weeks or months.  The personnel conducting the identification and
22 extraction of data will complete the analysis within ninety (90) days,
23 absent further application to this court.

24                              CONCLUSION

25      57.  Based on the foregoing, there is probable cause to believe
26 that the items identified in Attachment B have been used in the
27 commission of a crime and constitute evidence, fruits, and
28 instrumentalities of violations of conspiracy to commit securities fraud

1  in violation of 18 U.S.C. § 371, and securities fraud in violation of

2  15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, and will be found

3  at the telephone to be searched as provided in Attachment A.

4

5                          _____
                           Special Agent John Roberts
6                          Federal Bureau of Investigation

7
   Subscribed and sworn to before me this 14 day of December, 2018.
8

9

10                         _____
                           HONORABLE BARBARA L. MAJOR
11                         UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28